Filed 5/5/21  P. v. Wagner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ZACKARIAH RYAN WAGNER,<br><br>Defendant and Appellant. | F078806<br><br>(Tuolumne Super. Ct.<br>Nos. CRF52076 & CRF53372)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Paul Stubb, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P.J., Poochigian, J. and Detjen, J.

## INTRODUCTION

Appellant and defendant Zackariah Ryan Wagner was convicted after a jury trial of multiple felony and misdemeanor counts arising out of a series of domestic violence incidents and violations of a protective order. He was placed on probation and ordered to pay restitution fines and other fees and assessments. On appeal, he contends the court improperly ordered him to pay the restitution fines and other fees in violation of his constitutional rights as set forth in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm.

## FACTS

Defendant and the confidential victim (C.V.) became involved in a romantic relationship in 2014, and they were parents of one child. C.V. also had an older child with another man, with whom she shared custody.

In September 2016, C.V. purchased a house in Tuolumne County. Defendant's house was about a minute's drive away from C.V.'s house. C.V. testified defendant did not permanently move into her house, but he kept things there and frequently stayed overnight. C.V. testified that in October 2016, their relationship was "off and on" and "very rocky."

**Defendant hits C.V. (count 1)**

On October 9, 2016, defendant was at C.V.'s house. Their child was one year old. C.V. asked defendant to do a chore in the house for her. Defendant wanted to take a nap instead, and they started arguing. C.V. repeatedly told defendant to leave. Defendant hit her in the face with his open hand and ripped out her earring. When C.V. tried to get away, defendant hit her with a shoe and threw her against the wall. C.V. hit defendant with her fist every time he got close to her and inflicted a black eye on him. Defendant opened the door, threw some of his possessions outside, and left.

2.

C.V. testified she suffered a black eye, bruises on her body, and a broken bone in her finger that required surgery. C.V. admitted she suffered the broken bone when she hit defendant.

Defendant later apologized for the incident. C.V. and defendant continued living together for one more month. C.V. did not immediately contact law enforcement about this incident.

**Defendant breaks down the door (count 2)**

On November 22, 2016, C.V. invited defendant to her house to see their child. During the visit, defendant asked why he could not see the child more or by himself. C.V. said he was not safe, and she did not trust him; they started arguing. C.V. asked him to leave, and he complied. After she closed the door, defendant realized he forgot his cell phone in the house. He yelled at C.V. to open the door and threatened to break in.

C.V. told defendant that she would return his cell phone if he stood in the driveway by his car, and defendant agreed. She tossed the cell phone out of the house, and quickly closed and locked the door. The cell phone broke when she threw it on the ground.

Defendant got angry because the cell phone was broken. He punched the front door and kicked it open. He called C.V. a "f[**]king bitch" and said that was what she deserved, and he left.

C.V. called 911, and deputies responded to the house and saw the damaged front door. C.V. also told the deputies that defendant assaulted her the prior month, and admitted she broke her hand when she punched defendant.

A deputy reached defendant by telephone that night. He admitted he kicked in the door at C.V.'s house and said he lost his cool.

3.

**Defendant's first arrest and the protective order**

It was stipulated to the jury that on December 19, 2016, defendant was charged with inflicting a corporal injury (§ 273.5) with a great bodily injury enhancement (§ 12022.7, subd. (e)), and misdemeanor vandalism (§ 594, subd. (a)).

On March 7, 2017, defendant was arrested on a warrant.

On the morning of March 10, 2017, defendant made his first appearance in court for the criminal charges. He was personally served in court with a criminal protective order that prohibited personal, electronic, telephonic, or written contact with C.V., coming within 100 yards of C.V., and ordered him to stay away from C.V.'s vehicle, residence, and place of employment. The order provided for "peaceful contact with the protected persons named above as an exception to the no-contact or stay-away provisions … only for the safe exchange of children and court-ordered visitation as stated in the …." The remainder of that provision was left blank.

At trial, C.V. testified the child visitation provision was left blank because she did not have a custody agreement with defendant about their child, and she expected defendant to "stay away from me completely."

**Defendant's violations of the protective order (counts 3, 5 through 8)**

Later, on March 10, and also on March 17, 2017, C.V. received text messages from defendant that were not about their child. She described the messages as "his intimidating rants of anger." C.V. reported the messages to law enforcement.

A deputy contacted defendant; defendant said he knew about the protective order but thought he could send text messages about visitation.

Both defendant and C.V. had their own Facebook pages and previously communicated with each other on the site. On March 25, 2017, defendant posted a message on C.V.'s Facebook page that said, " 'Lies, all lies, can't believe I had a child with someone so selfish and mean. I want to see my kid, been a month and two days already. Bullshit.' "

4.

On the same day, defendant parked his truck in front of C.V.'s house, and she took photographs of his truck. When he drove away, defendant held a book that belonged to her father out of the truck's window and yelled, " 'I guess you're not f[**k]ing getting this back.' " C.V. had previously asked defendant to return the book and other items. She reported this incident to law enforcement.

On or about March 28, 2017, the family law court issued an order that prohibited visitation between defendant and their child and granted sole custody to C.V. The order was filed in response to C.V.'s motion for a civil protective order and custody. Defendant never filed for custody of their child or sought an order for visitation.

On April 1, 2017, C.V. met defendant at a park so he could play with their child. She thought it would be safe to see him in a public place. During the visit, defendant asked about someone at her house, and C.V. said it was none of his business. Defendant got angry, called C.V. a "f[**]king whore," and asked who she was sleeping with. C.V. told defendant to leave immediately. C.V. did not report this incident to law enforcement when it occurred. Later, on April 1, 2017, defendant sent her text messages that were not about their child.

On April 2, 2017, C.V. reported the previous day's text messages to law enforcement. A deputy contacted defendant about the text messages, and defendant admitted he sent them. The deputy ordered defendant not to contact her anymore, and defendant agreed.

On April 5, 2017, C.V. was at work and received several calls from a restricted number. When she finally answered the call, defendant was on the line, and he was "[t]hreatening and angry, cussing." C.V. put the call on speakerphone so that a coworker could hear, and the coworker also recognized defendant's voice. C.V. reported this incident because defendant called her work phone.

On April 6, 2017, C.V. was driving out of a restaurant's parking lot when defendant pulled in front of her and blocked her car from leaving for about two minutes.

5.

C.V. finally backed up so she could drive out from another exit. Defendant turned around, drove toward C.V.'s car, and passed her while going in the opposite direction. C.V. testified defendant gave her a "threatening" look. C.V. reported this incident because she was scared.

A deputy spoke to defendant about this incident, and defendant said he was at the restaurant to get something to eat, and claimed C.V. yelled at him to stop stalking her. The deputy advised defendant that he could not have any contact with C.V., and defendant said he understood.

On April 15, 2017, C.V. was at her house with a male friend, who had parked on the street. C.V. received several calls from a blocked number, but she did not answer. C.V. testified she had never received a call from a blocked number prior to the restraining order being issued.

At approximately 11:10 p.m., C.V. heard a truck idling outside, and then heard defendant's voice yell, " 'F[**]king whore.' " C.V. looked outside and saw defendant drive away in his truck. Defendant turned around and again drove by her house and yelled the same curse. C.V. took a video of the incident on her cell phone.

C.V. called the sheriff's department, and deputies responded to her house. While they were there, C.V. received another call from a blocked number.[1]

**Resisting arrest (count 4)**

Around midnight on April 16, 2017, Tuolumne County Sheriff's Deputy Zanini contacted defendant at his residence about the incident that had just occurred at C.V.'s house. Defendant denied calling C.V. or driving past her house. As the conversation continued, defendant raised his voice and became agitated; he said he was angry.

---

[1] In counts 5 and 6, defendant was charged with violating the protective order on April 15, 2017, based on parking outside her house and yelling at her, and making the phone calls. The jury found him guilty of count 5 and not guilty of count 6.

Defendant eventually admitted that he called C.V. Deputy Zanini advised defendant that he had violated the protective order and was going to be arrested. Defendant ran away and ignored orders to stop. Zanini chased him for about 50 yards, and then caught up and tackled him.

Deputy Zanini arrested defendant and found him in possession of a cell phone. Defendant consented to Zanini's review of the call history. The phone showed it had made eight calls to C.V.'s number prior to midnight and one after midnight. Defendant's cell phone was set so his number was blocked when he made the calls.

On April 16, 2017, defendant was booked into jail and released a few hours later.

**Stalking (count 9) and additional violations of the protective order (counts 10, 12 through 14)**

On April 19, 2017, C.V. reported to the sheriff's department that eggs were thrown onto her car. C.V. did not feel safe, so C.V. and her children stayed at her mother's house.

C.V. testified that between April 17 and 19, 2017, she received multiple calls from a blocked number on both her personal cell phone and work phone. When she answered her work phone, she recognized defendant's voice; he cursed her and accused her of being with other men. She answered her personal phone a few times, recognized defendant's voice, and hung up.

On April 19, 2017, C.V. was driving from her mother's house to work. She saw defendant parked on the side of the road. Defendant pulled into a shopping center's parking lot, and C.V. followed him. She told him to leave her alone and stop following her. Defendant laughed and said she was lucky that he did not kill her. As defendant drove away, he made a motion of sliding his finger across his neck. C.V. was afraid defendant was going to kill her and reported this incident to law enforcement.

On April 25, 2017, C.V. was at work, and in an office with an interior window that faced a hallway. Defendant suddenly appeared at the window. Defendant taped a letter

7.

to the window, shook his head, and walked away. C.V. alerted a coworker, who also saw defendant walk away. C.V. reported the incident to law enforcement and gave them the letter, which was in defendant's handwriting. When she reported the incident, she was crying and afraid.[2]

On April 29, 2017, C.V. was leaving her house when defendant arrived in his truck. Defendant yelled that he could not believe that she would not let him see their child. C.V. reported the incident to law enforcement.[3]

**Defendant's second arrest**

On May 21, 2017, C.V. was driving away from her house when defendant drove by. C.V. drove in the other direction to avoid him, but defendant turned around and followed her. C.V. drove into a parking lot because it was a public place. She filmed defendant's truck on her cell phone and called law enforcement, and defendant left.

Deputy Poel responded to the scene and took C.V.'s report. As they were talking, defendant drove by the area. Deputy Lockhart responded to Poel's dispatch, saw defendant's vehicle, and tried to catch up with him. Lockhart testified defendant accelerated when he saw his patrol car. Lockhart accelerated to 65 miles per hour and caught up with defendant after about one mile; defendant pulled over.

Deputy Lockhart advised defendant he had violated the protective order. Defendant was "angry, agitated, and belligerent and refused to cooperate initially." Defendant said he knew about the restraining order, and it was a coincidence he was driving on the same street as C.V. Defendant said it was "bullshit" that he had to adjust his life because C.V. had a restraining order; he did not understand why he could not go

---

[2] In closing argument, the prosecutor stated the note said that "[defendant] loves her, how he can't live without her, and then at the end, he says, goodbye, my time here is done."

[3] Defendant was found not guilty of count 11, violating a court order, which was based on the incident of April 29, 2017.

8.

wherever he wanted "just because she was going there, too;" and he blamed C.V. for getting in his way during the incident.

Deputy Lockhart arrested defendant for violating the protective order. Defendant "remained belligerent and was less than polite in speaking with me." Defendant said C.V. constantly called and harassed him, and that is why she called the police. Lockhart asked defendant if he had reported this alleged harassment. Defendant said no, that the sheriff's department would not do anything for him, and it was "ridiculous that he had to adjust his life just because she had the restraining order in place."

Defendant was booked into jail but released later that day.

**Additional violations of the protective order (counts 13 & 14)**

On May 23, 2017, C.V. received more calls at work from a blocked number. She answered and recognized defendant's voice. Defendant yelled, " 'You f[**]king bitch, I can't believe you won't let me see my kid.' " C.V. hung up and reported the incident to law enforcement.

On the same day, Deputy Lockhart met with C.V. and described her as "terrified." C.V. said she was afraid to go to work or anywhere in the community because "of the constant fear that she would run into him somewhere," and he would harm her.

On June 5, 2017, C.V. again received a blocked call at work. She answered it and recognized defendant's voice. Defendant said, " 'Just to let you know I f[**]king hate you.' " C.V. hung up and reported the incident to law enforcement.

As a result of defendant's conduct during these incidents, C.V. changed her cell phone number and purchased security cameras, motion lights, and metal screen doors, to try and feel safe in her home. She still did not feel safe from defendant, however, and testified she ultimately moved out of her house because she was worried about what he might do to her. C.V. testified she lost custody of her older child "for a time" because that child's father learned of defendant's conduct and believed his child was in danger.

9.

## DEFENDANT'S TRIAL TESTIMONY

Defendant testified that he was living with C.V. when the October 9, 2016, incident took place. After the argument about the nap, C.V. told him to get out, and he refused. She became angry and repeatedly hit defendant with her closed fist. In self-defense, he struck her with his open hand and a shoe, and he left after a few minutes.

Defendant admitted he kicked down C.V.'s door after she threw the cell phone out of her house, during the November 22, 2016, incident.

Defendant knew the criminal protective order existed, and insisted he never followed C.V. around. Defendant also knew on March 29, 2017, that the family court had issued an order the prior day that prohibited any visitation with his child.

Defendant denied trying to block C.V. from leaving the parking lot during the April 6, 2017, incident. He denied threatening C.V. during the April 19, 2017, incident, and testified that C.V. followed him, and he told her to leave him alone.

Defendant testified that he did not threaten C.V. during the incident when he met C.V. and their child at the park; he was just happy to see his child.

Defendant denied following or harassing C.V. while the protective order was in place. Defendant admitted that he called and sent text messages to C.V. at certain times while the protective order existed, but claimed he did that because of their child. Defendant admitted he called C.V. nine times from a blocked number on August 15 and 16, 2017, and lied to the deputy about it.

Defendant also admitted that he was angry when he saw a vehicle parked in front of C.V.'s house, presumed a man was there, and yelled that he wanted to see his child. He did not recall calling C.V. an "f'ing whore." Defendant admitted he ran away when Deputy Zanini tried to arrest him. Defendant denied that he called C.V.'s work phone, but admitted he appeared outside C.V.'s office and posted the note on her window, and that he posted the comments on C.V.'s Facebook page.

10.

## PROCEDURAL BACKGROUND

On September 27, 2018, an information was filed against defendant that was consolidated for purposes of trial and alleged 14 counts from four separate case numbers.

In case No. CRF52076, defendant was charged with count 1, infliction of corporal injury to the parent of his child on or about October 9, 2016 (§ 273.5, subd. (a)), with an enhancement for the infliction of great bodily injury (§ 12022.7, subd. (e)); and count 2, misdemeanor vandalism on or about November 22, 2016 (§ 594, subd. (a)).

In case No. CRM52911, defendant was charged with count 3, misdemeanor disobeying a court order in case No. CRF52076 on March 17, 2017 (§ 166, subd. (a)(4)).

In case No. CRM53144, defendant was charged with count 4, misdemeanor obstructing a peace officer, Deputy Zanini, on April 16, 2017 (§ 148, subd. (a)(1)), and counts 5 through 8, misdemeanor disobeying a court order in case No. CRF52076 on, respectively, April 15, April 15, April 5, and April 1, 2017.

In case No. CRF53372, defendant was charged with count 9, felony stalking while subject to a temporary restraining order, or about or between April 19 and June 5, 2017 (§ 646.9, subd. (b)), with an on-bail enhancement (§ 12022.1); and counts 10 through14, misdemeanor disobeying a court order in case No. CRF52076, on or about, respectively, April 25, April 29, May 21, May 23, and June 23, 2017.

**Convictions**

On October 5, 2018, the jury found defendant guilty of all counts with the following exceptions:  it found defendant was not guilty of counts 6 and 11, disobeying a court order, and found the great bodily injury enhancement alleged for count 1, infliction of corporal injury, was not true.  The court found the on-bail enhancement true for count 9, stalking.

## SENTENCING HEARING

On November 20, 2018, the trial court conducted the sentencing hearing.  The court stated it agreed with the probation report's recommendation for probation.

11.

The prosecutor objected to placing defendant on probation because he was not a good candidate and a prison term was more appropriate. While this was defendant's first felony case, "he's come out the gate swinging" and inflicted "nearly a year of terror" on C.V. He repeatedly ignored the court order and committed acts of violence against her. The prosecutor further argued defendant did not take responsibility for his actions, he did not show remorse, and he claimed to be the victim when he talked to the probation officer. Defendant had "terrorized" C.V. and "destroyed" her sense of security. The prosecutor reminded the court that C.V. had requested a full protective order.

The court stated defendant's conduct was egregious, it was disappointed that he never took responsibility for his actions,[4] the jury did not believe his version, and acknowledged that domestic violence victims "really never get over the impact of this." The court wanted to give defendant another chance, however, because he had "no record" and deserved a chance on probation.[5] The court warned defendant that he would go to prison if he violated probation. The prosecutor stated the maximum possible term would be seven years. The court advised defendant that he had "a lot hanging over your head" because it would impose an aggravated term if he violated probation and "came back with a similar situation."

The court advised defense counsel that there were several pages in the probation report that outlined the statutory fees and assessments and asked if defendant waived a

---

[4] In his statement to the probation officer, defendant reasserted much of his trial testimony, and claimed C.V. fabricated her claims that he violated the protective order and he only contacted C.V. about visitation issues.

[5] While defendant did not have any prior felony convictions or prison terms, he was placed on probation for prior misdemeanor convictions for violations of Vehicle Code sections 23152, subdivision (a) and 14601.5, subdivision (a) in 2000; Vehicle Code section 23152, subdivision (a) and section 1320, subdivision (a) in 2000; and Vehicle Code sections 14601., subdivision 1(a) and 40508, subdivision (a) in 2016.

formal reading of these amounts. Defense counsel said he had gone over the amounts with defendant and waived reading the specific amounts into the record.

However, defense counsel objected to the large amount recommended for victim restitution, and requested a hearing because he had not seen any evidence to support the amount requested.[6] The prosecutor said he had the supporting paperwork and would provide copies to defense counsel. The court said it would defer addressing victim restitution.

**Case No. CRF53372**

Based on defendant's convictions in count 9, stalking, and counts 10, 12, 13, and 14, disobeying a court order, the court suspended imposition of sentence for five years and placed defendant on probation subject to certain terms and conditions, including drug and alcohol testing, cooperating with the probation officer for psychological or psychiatric/alcohol and/or drug treatment, completion of a 52-week domestic violence counseling program, plus six months in jail.

The court imposed a restitution fine of $300 (§ 1202.4, subd. (b)), suspended the probation termination fine of $300 (§ 1202.44), and reserved ruling on victim restitution.

The court also imposed a total of $2,690 in fines, fees, and assessments based on the following amounts imposed as to, respectively, each of counts 9, 10, 12, 13, and 14, as itemized in the probation report:[7]

(1) Base fines of $200 for count 9, and $100 for each of counts 10, 12 through 14;

(2) State penalty assessments of $200 for count 9, and $100 for each of counts 10, 12 through 14 (§ 1464; 100 percent of the base fine);

---

[6] The probation report recommended total victim restitution of $37,732.87 and stated that C.V. had presented receipts for $37,212.87 for medical costs, physical therapy, and the costs to add security systems to her house; plus $520 for moving expenses.

[7] The court stated it was imposing the fines and fees recommended for this case as stated in the probation report, which listed a total amount of $2,690 in case No. CRF53372. At the sentencing hearing, the court misstated this amount as $2,609.

(3) County penalty assessments of $140 for count 9, and $70 for each of counts 10, 12 through 14 (Gov. Code, § 76000; 70 percent of the base fine);

(4) State surcharges of $40 for count 9, and $20 for each of counts 10, 12 through 14 (§ 1465.7; 20 percent of the base fine);

(5) Court construction penalties of $100 for count 9, and $50 for each of counts 10, 12 through 14 (Gov. Code, § 70372; 50 percent of the base fine);

(6) DNA fund penalties of $100 for count 9, and $50 for each of counts 10, 12 through 14 (Gov. Code, §§ 76104.6, 76104.7; 50 percent of the base fine);

(7) Court operations assessment of $40 for each of counts 9 through 10, 12 through 14 (§ 1465.8); and

(8) Criminal conviction assessments of $30 for each of counts 9 through 10, 12 through 14 (Gov. Code, § 70373).

The court further imposed $50 per month for probation supervision services (§ 1203.1b); and a criminal justice administration fee of $183 (Gov. Code, § 29550, subds. (b), (c), § 29550.2).

**Case No. CRF52076**

Based on defendant's conviction for count 1, felony infliction of corporal injury, and count 2, misdemeanor vandalism, the court suspended imposition of sentence for five years and placed defendant on probation subject to the same certain terms and conditions, including a consecutive term of six months in jail.

The court imposed a restitution fine of $300 (§ 1202.4, subd. (b)), suspended the probation termination fine of $300 (§ 1202.44), and reserved ruling on victim restitution.

The court also imposed a total of $1,810 in fines, fees, and assessments based on the following amounts imposed as to, respectively, counts 1 and 2:

(1) Base fines of $200 and $100;

(2) State penalty assessments of $200 and $100 (§ 1464; 100 percent of the base fine);

14.

(3)  County penalty assessments of $140 and $70 (Gov. Code, § 76000; 70 percent of the base fine);

(4)  State surcharges of $40 and $20 (§ 1465.7; 20 percent of the base fine);

(5)  Court construction penalties of $100 and $50 (Gov. Code, § 70372; 50 percent of the base fine);

(6)  DNA fund penalties of $100 and $50 (Gov. Code, §§ 76104.6, 76104.7; 50 percent of the base fine);

(7)  Court operations assessment of $40 for each count (§ 1465.8);

(8)  Criminal conviction assessments of $30 for each count (Gov. Code, § 70373); and

(9)  A domestic violence funds fee of $500 for count 1 only (§ 1203.097, subd. (a)(5)).

The court further imposed a $578.75 fee for preparation of the presentence report; $50 per month for probation supervision services (§1203.1b); and a criminal justice administration fee of $183 (Gov. Code, § 29550, subds. (b), (c), § 29550.2).

Finally, the court imposed a 10-year protective order that prohibited contact with C.V. and the child; the order would expire in 2028.  The court stated that it would modify the order if the family court granted defendant visitation or joint custody of the child.

### *Victim restitution*

After the court placed defendant on probation, the prosecutor stated C.V. was present and could establish the foundation for the victim restitution amounts recommended in the probation report.  The court agreed.

In response to the prosecutor's questions, C.V. testified she presented receipts and other documents to the prosecutor's office to support her request for victim restitution, identified the documents, and that she also received payments from the victim's compensation board.  The court set a hearing on the victim restitution issue.

15.

On January 18, 2019, defendant filed notices of appeal in case Nos. CRF52076 and CRF53372.

**Victim restitution order**

On March 6, 2019, the court filed an order that stated the parties stipulated that defendant would pay $12,478.43 to C.V. in direct victim restitution, plus $2,957.10 to the Victim Compensation and Government Claim Board to reimburse amounts already paid to C.V. (§ 1202.4, subd. (f)).

**Section 1237.2 motion**

On or about November 15, 2019, defendant filed a motion in the trial court, pursuant to section 1237.2, for an order to vacate the restitution fines and other fees imposed because the court failed to find he had the ability to pay those amounts as required by *Dueñas*.

On or about December 3, 2019, the court denied the motion.

## DISCUSSION

Defendant contends that the restitution fines, and other fees and assessments, must be stricken because the court violated his due process rights when it imposed these amounts, as set forth in *Dueñas*. Defendant asserts this case is similar to *Dueñas* because he was placed on probation, he was ordered to pay a large amount of fines and fees, the court never determined whether he had the ability to pay, and there was evidence he was unemployed and had no income. Defendant asserts the matter must be remanded for an ability to pay hearing.

**A.     Forfeiture**

As we will explain below, *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to

16.

pay" before it imposes any fines or fees. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164, 1167.)[8]

However, we begin with defendant's argument that, even though defense counsel did not object to the court's imposition of the restitution fines, fees, and assessments, he did not forfeit review of these issues because the sentencing hearing occurred prior to the decision in *Dueñas*, and the ruling could not have been anticipated.

While *Dueñas* was not decided at the time of the sentencing hearing, we agree defendant did not forfeit review of this issue but for a different reason. Section 1202.4, subdivisions (c) and (d) only permits a party to raise an ability to pay objection when the court imposes a restitution fine above the statutory minimum amount of $300. In this case, the court imposed the statutory minimum restitution fines of $300 for each case pursuant to section 1202.4, subdivision (b). Under the governing law at the time of the sentencing hearing, defendant lacked statutory authority to object to the minimum restitution fines, and also to the other fees and assessments. (Cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.)[9]

---

[8] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

[9] Defendant further argues he did not forfeit review since he filed a post-judgment motion with the trial court pursuant to section 1237.2 after *Dueñas* was decided. However, section 1237.2 requires the defendant to first seek relief with the trial court in certain situations in order to perfect an appeal. The compliance with section 1237.2 does not otherwise excuse a defendant's failure to object at the sentencing hearing. (See, e.g., *People v.Torres* (2020) 44 Cal.App.5th 1081, 1087, 1088; *People v. Hall* (2019) 39 Cal.App.5th 502, 505.)

Given our conclusion that defendant did not forfeit review, we need not reach defendant's alternative claim that defense counsel was prejudicially ineffective for failing to object.

## B. Victim Restitution

We note that while defendant lacked statutory authority to object to the restitution fines, fees, and assessments, defense counsel exercised the statutory ability to request a hearing on the proposed order for over $37,000 in victim restitution, as recommended in the probation report. (See § 1202.4, subd. (f).) In response to defendant's objection, the court heard C.V.'s testimony that she presented certain receipts to the prosecutor's office for various expenses, and the prosecutor stated he would provide those documents to the defense. The court then set a date for an evidentiary hearing on victim restitution.

According to the record, however, the parties ultimately stipulated that defendant would pay $12,478.43 to C.V. in direct victim restitution, plus $2,957.10 to the Victim Compensation and Government Claim Board to reimburse amounts already paid to C.V. (§ 1202.4, subd. (f)).

To the extent it might be raised, we reject any argument that an ability to pay objection applies to the court's order to pay direct victim restitution to C.V. and reimburse the victim restitution fund. Even if we agreed with the rule announced in *Dueñas,* it appears settled that it does not apply to victim restitution orders. (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Evans* (2019) 39 Cal.App.5th 771, 777; *People v. Allen* (2019) 41 Cal.App.5th 312, 326.) In addition, the court's order stated the parties stipulated to the amounts ordered for victim restitution, and defendant's agreement forfeited any challenge to the amount of the victim restitution order. (*People v. Anderson* (2010) 50 Cal.4th 19, 26, fn. 6; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. Mays* (2017) 15 Cal.App.5th 1232, 1237.)

## C. Dueñas

Defendant argues the court improperly imposed the restitution fines, fees, and assessments as conditions of his probation in violation of his due process rights because it failed to conduct a hearing on his ability to pay.

18.

In *Dueñas*, the defendant was an indigent, homeless mother of two, who subsisted on public aid while suffering from cerebral palsy. She had dropped out of high school because of her illness, and she was unemployed. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1160–1161.) As a teenager, the defendant's driver's license was suspended when she could not pay some citations. (*Id.* at p. 1161.) She then was convicted of a series of misdemeanor offenses for driving with a suspended license, and in each case, she was given the choice to pay mandatory fees and fines, which she lacked the means to do, or go to jail. (*Ibid.*) She served jail time in the first three of these cases, but still faced outstanding debt, which increased with each conviction. (*Ibid.*)

After her fourth conviction of driving with a suspended license, the defendant was placed on probation and again ordered to pay mandatory fees and fines. The court imposed a $30 court conviction assessment (Gov. Code, § 70373, subd. (a)(1)); a $40 court operations assessment (§ 1465.8, subd. (a)(1)); and the minimum restitution fine of $150 for a misdemeanor (§ 1202.4, subd. (b)(1)). The court also imposed and stayed a probation revocation restitution fine (§ 1202.44). (*Dueñas, supra*, 30 Cal.App.5th at pp. 1161–1162.) The defendant challenged the fees and fines imposed under sections 1202.4 and 1465.8 and Government Code section 70373. (*Dueñas*, at p. 1164.) The trial court rejected her constitutional arguments that due process and equal protection required the court to consider her ability to pay these fines and assessments. (*Id.* at p. 1163.)

*Dueñas* held the defendant's due process rights had been infringed and that an ability to pay hearing was required so the defendant's "present ability to pay" could be determined before assessments were levied for a court operations assessment (§ 1465.8, subd. (a)(1)) and a criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) *Dueñas* also held that the minimum restitution fine of $150 for the misdemeanor conviction (§ 1202.4, subd. (b)(1)) had to be stayed. *Dueñas* reached these conclusions even though section 1202.4 barred consideration of a defendant's ability to pay unless the judge was considering a fine over

19.

the statutory minimum. (§ 1202.4, subd. (c).) *Dueñas* held that "execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.)

We disagree with the holding in *Dueñas* and find the matter need not be remanded for further findings. As explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), we believe *Dueñas* was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles*, at pp. 1068–1072.) Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted, and thus not excessive under the Eighth Amendment. (*Aviles*, at p. 1072.)

Defendant acknowledges this court's opinion in *Aviles* but argues we must reconsider the ruling because it was wrongly decided. We decline to reconsider *Aviles* in the absence of further guidance on this issue by the California Supreme Court.

Even if we agreed with *Dueñas*, defendant's reliance on that case is misplaced because it is distinguishable from the present matter. The defendant in *Dueñas* lost her driver's license because she was too poor to pay her juvenile citations. She continued to offend because the aggregating criminal conviction assessments and fines prevented her from recovering her license. *Dueñas* described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Dueñas, supra*, 30 Cal.App.5th at pp. 1163–1164.)

In contrast to *Dueñas*, defendant's multiple felony and misdemeanor convictions in this case for the infliction of corporal injury, vandalism, resisting arrest, and stalking, and eight separate convictions for violating the protective order, and his resulting probationary status, were not a product of any court's prior imposition of criminal assessments and fines. Defendant was not caught in an unfair cycle of incarceration, and

he could have avoided the present convictions regardless of his financial circumstances. *Dueñas* is thus distinguishable and it has no application in this matter. (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 928–929 [declining to apply *Dueñas'*s "broad holding" beyond its unique facts]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 ["*Dueñas* is distinguishable"].)

**D.     The Court Did Not Violate Defendant's Constitutional Rights**

We further find that even if *Dueñas* applied to this case, the trial court did not violate defendant's constitutional rights. The probationer in *Dueñas* presented compelling evidence that the imposed assessments resulted in ongoing *unintended* punitive consequences against her. *Dueñas* determined that these unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.)

*Dueñas* noted the imposed financial obligations were also potentially unconstitutional under the excessive fines clause of the Eighth Amendment. However, *Dueñas* stated that "[t]he due process and excessive fines analyses are sufficiently similar that the California Supreme Court has observed that '[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process.' [Citation.]" (*Dueñas, supra*, at p. 1171, fn. 8.)

The due process analysis in *Dueñas* was criticized in *Aviles, supra,* 39 Cal.App.5th at pp. 1059–1060 and *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, review granted November 26, 2019, S258946 (*Hicks*). (See also *People v. Kingston* (2019) 41 Cal.App.5th 272, 279 (*Kingston*) [finding *Hicks* to be "better reasoned" than *Dueñas*]; *People v. Caceres, supra*, 39 Cal.App.5th at p. 928 ["In light of our concerns with the due process analysis in *Dueñas*, we decline to apply its broad holding requiring trial courts in all cases to determine a defendant's ability to pay before imposing court assessments or restitution fines."].)

21.

As we explained in *Aviles*, the " 'excessive fines' " clause in the Eighth Amendment to the United States Constitution was more appropriate than a due process argument for an indigent defendant to challenge the imposition of fees, fines and assessments. (*Aviles, supra*, 39 Cal.App.5th at p. 1069.) *Aviles* found no constitutional violation for the imposition of assessments and fines imposed on a felon who, after fleeing from officers, shot and wounded two of them. (*Id.* at pp. 1059–1060.) *Aviles* also concluded that any presumed error was harmless because the felon had the ability to earn money while in prison. (*Id.* at pp. 1075–1077.)

*Hicks* held that, in contrast to *Dueñas*'s due process analysis, a due process violation must be based on a fundamental right, such as denying a defendant access to the courts or incarcerating an indigent defendant for nonpayment. *Hicks* concluded that *Dueñas'*s analysis was flawed because it expanded due process in a manner that grants criminal defendants a right not conferred by precedent; that is, an ability to pay hearing *before* assessments are imposed. (*Hicks, supra*, 40 Cal.App.5th at pp. 325–326.) *Hicks* rejected a due process challenge to the imposition of fines and assessments on a felon who, while under the influence of a stimulant, resisted arrest. (*Id.* at pp. 323, 329–330.)

We similarly reject any claim that the trial court violated due process. The fines and fees imposed in this case do not implicate the traditional concerns of fundamental fairness. Defendant was not denied access to the courts or prohibited from presenting a defense. (See *Griffin v. Illinois* (1956) 351 U.S. 12, 18–20 [due process and equal protection require a state to provide criminal defendants with a free transcript for use on appeal]; *Kingston, supra*, 41 Cal.App.5th at p. 281; *Hicks, supra*, 40 Cal.App.5th at p. 326.) Defendant was not incarcerated because he was unable to pay prior fees, fines or assessments. (See *Bearden v. Georgia* (1983) 461 U.S. 660, 672–673 [fundamental fairness is violated if a state does not consider alternatives to imprisonment if a probationer in good faith cannot pay a fine or restitution]; *Kingston, supra*, 41 Cal.App.5th at p. 281; *Hicks, supra*, 40 Cal.App.5th at p. 326.)

The instant case does not present the unique concerns that existed in *Dueñas.* There is no evidence to establish or even reasonably suggest that defendant faces ongoing unintended punitive consequences. Defendant points to the statements in the probation report that he was unemployed and had no income. However, the probation report also stated defendant was 42 years old at the time of the sentencing hearing, he was employed as a grocery store clerk from 1992 to 1997, as a clerk at another grocery store from 1997 to 1999; a powder coater for a company from 2002 to 2007, and delivered newspapers from 2015 to March 2017. While defendant signed a statement of assets that said he was unemployed and had no income, he also told the probation officer that "[u]pon completion of any time imposed, … he planned on farming on his mother's property."

Defendant does not establish how he suffered a violation of a fundamental liberty interest. Since unintended consequences are not present, it was not fundamentally unfair for the court to impose the fees, fines and assessments in this matter without first determining defendant's ability to pay. As such, the trial court did not violate defendant's due process rights. (See *Kingston, supra*, 41 Cal.App.5th at p. 282; *Hicks, supra*, 40 Cal.App.5th at p. 329.) As we have already noted, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and thus not excessive under the Eighth Amendment. (*Aviles, supra*, 39 Cal.App.5th at p. 1072.)

Based on this record, we conclude the court's order did not violate defendant's constitutional rights.

## DISPOSITION

The judgment is affirmed.